Hearing Date:  February 4, 2014 at 10:00 a.m.
Objection Deadline:  January 28, 2014 at 5: 00 p.m.

Rubin LLC
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel:  212. 390.8054
Fax: 212.390.8064
E-mail: prubin@rubinlawllc.com
Paul A. Rubin

Counsel for Breakers Capital LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:                                              Chapter 11

SOLERA HOLDINGS L.L.C.,                             Case No. 13-20006 (RDD)

                  Debtor.
------------------------------------------------------x


**MOTION OF BREAKERS CAPITAL LLC TO CONVERT CASE TO CHAPTER 7**

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................2

STATEMENT OF FACTS ...............................................................................................5

    A. Mr. Lopez Controls Both the Debtor and its Primary Tenant.........................5

    B. The Lease Between Solera Holdings and Solera Corp. .................................6

    C. Information From Debtor's Schedules and Statement of Financial Affairs ................8

    D. The Loan Held By Breakers ........................................................................9

    E. Events Leading Up to Execution of the July 17, 2013 Stipulation That Mr. Lopez
       Claims Was Signed By Attorney Morrison Without Mr. Lopez Knowing its Terms .11

    F. Mr. Lopez Filed Two Personal Bankruptcy Cases
      and Selected Mr. Morrison as His Counsel Each Time ................................14

    G. The Debtor's Lack of Reporting Regarding the Rents, Despite Breakers' Efforts .....15

    H. The Debtor's Ill-Fated Proposed Plan of Reorganization.............................17

LEGAL ARGUMENT.....................................................................................................18

I.     CAUSE EXISTS TO CONVERT THE DEBTOR'S
      CASE TO A CASE UNDER CHAPTER 7....................................................18

    A. The Applicable Standard...........................................................................18

    B. The Debtor's Disabling Conflicts of Interest and Self-Dealing Constitute Cause for
      Conversion .............................................................................................21

    C. The Debtor's Failure to Account for Cash Collateral Also Constitutes Cause For
      Conversion .............................................................................................27

    D. The Debtor's Failure to File Operating Reports Constitutes Further Cause for
      Conversion .............................................................................................29

    E. The Debtor's Gross Mismanagement of the Estate Constitutes Further Cause for
      Conversion .............................................................................................30

    F. Cause Also Exists Because This Case Bears the Hallmarks of a Filing for an
      Impermissible Purpose.............................................................................31

II.    CONVERSION FO THE DEBTOR'S CASE TO A CASE UNDER CHAPTER 7 IS IN
     THE BEST INTERESTS OF CREDITORS AND THE ESTATE ....................32

CONCLUSION................................................................................................................33

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. La Salle St. P'ship,*
   526 U.S. 434, 453 (1999)............................................................................22

*Commodity Futures Trading Comm'n v. Weintraub,*
   471 U.S. 343 (1985)................................................................................22

*Fulton State Bank v. Schipper (In re Schipper),*
   933 F.2d 513 (7th Cir. 1991) .................................................................23

*Green River Prod. Credit Assoc. v. Alvey (In re Alvey),*
   56 B.R. 170 (Bankr. W.D. Ky. 1985) ....................................................28

*Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.),*
   227 B.R. 606 (S.D.N.Y. 1998)...............................................................22

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
   330 F.3d 548 (3d Cir. 2003)...................................................................22

*Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.),*
   838 F.2d 1133 (10th Cir. 1988)..............................................................24

*Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.),*
   14 F.3d 240 (4th Cir. 1994) ...................................................................33

*Toibb v. Radloff,*
   501 U.S. 157 (1991)................................................................................22

*Wolf v. Weinstein,*
   372 U.S. 633 (1963)................................................................................22

*In re 3 Ram, Inc.,*
   343 B.R. 113 (Bankr. E.D. Pa. 2006) ...................................................19

*In re 15373 Mem'l Corp. v. Bepco, L.P.,*
   589 F.3d 605 (3d Cir. 2009)...................................................................19

*In re Bellevue Place Assocs.,*
   171 B.R. 615 (Bankr. N.D. Ill. 1994) ....................................................23

*In re A-1 Specialty Gasolines, Inc.,*
   246 B.R. 445 (Bankr. S.D. Fla. 2000)....................................................28

*In re C-TC 9th Ave. P'ship,*
   113 F.3d 1304 (2d Cir. 1997).................................................................19

*In re Euro American Lodging Corp.,* 365 B.R. 421 (Bankr. S.D.N.Y. 2007) ...............................25

*In re Evans,* 48 B.R.
   46 (Bankr. W.D. Tex. 1985) ..................................................................31

*In re Fiesta Homes of Georgia, Inc.,*
   125 B.R. 321 (Bankr. S.D. Ga. 1990) ...................................................26

*In re Four Seasons Marine & Cycle, Inc.,*
   263 B.R. 764 (Bankr. E.D. Tex. 2001) ..................................................................28

*In re Four Square Broad., Inc.,*
   77 B.R. 404 (Bankr. W.D.N.Y. 1987) ...................................................................22

*In re Gateway Access Solutions, Inc.,*
   374 B.R. 556 (Bankr. M.D. Pa. 2007) ...................................................................19

*In re Great Ne. Lumber & Millwork Corp.,*
   20 B.R. 610 (Bankr. E.D.Pa. 1982) ......................................................................30

*In re Halal 4 U LLC,*
   2010 WL 3810860, (Bankr. S.D.N.Y. Sept. 24, 2010) .........................................30

*In re Haluz, Inc.,*
   665 F.2d 213 (8th Cir. 1981) ................................................................................22

*In re Humphreys Pest Control Franchises, Inc.,*
   40 B.R. 174 (Bankr. E.D. Pa. 1984) .....................................................................24

*In re Innkeepers USA Trust,*
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ..................................................................22

*In re L.S. Good & Co.,*
   8 B.R. 312 (Bank. W. Va. 1980) ...........................................................................24

*In re Landmark Atlantic Hess Farm, LLC,*
   2011 WL 831724 (Bankr. D.Md. March 3, 2011) .................................................29

*In re Marvel Entm't Group,*
   140 F.3d 463 (3rd Cir. 1998) ................................................................................22

*In re Microwave Prods. of Am., Inc.,*
   102 B.R. 666 (Bankr. W.D. Tenn. 1989) ...............................................................24

*In re Mobile Freezers, Inc.,*
   146 B.R. 1000 (S.D. Ala. 1992) ............................................................................33

*In re Natural Plants & Land Mgmt C.o., Ltd.,*
   68 B.R. 394 (Bankr. S.D.N.Y. 1986) ....................................................................25

*In re Nautilus of New Mexico, Inc.,*
   83 B.R. 784 (Bankr. D. N.M. 1988) ......................................................................22

*In re PRS Insurance Group, Inc.,*
   274 B.R. 381 (Bankr. D. Del. 2001) .....................................................................24

*In re Prisco Props., LLC,*
   2010 WL 4412095, (Bankr. D.N.J. Nov. 1, 2010) ................................................32

*In re Products Int'l Co.,*
   395 B.R. 101 (Bankr. D. Ariz. 2008) ....................................................................18

*In re Roma Group. Inc.,*
   165 B.R. 779 (Bankr. S.D.N.Y. 1994) ..................................................................29

*In re Russell,*
    60 B.R. 42 (Bankr. W.D. Ark. 1985) ........................................................................22

*In re San Juan Hotel,*
    847 F.2d 931 (1st Cir. 1988) ..................................................................................23

*In re Staff Inv. Co.,*
    146 B.R. 256 (Bankr. E.D. Cal. 1992) ...................................................................33

*In re Tel-Net Hawaii, Inc.,*
    105 B.R. 594 (Bankr. D. Hawaii 1989) ..................................................................25

*In re Tornheim,*
    181 B.R. 161 (Bankr. S.D.N.Y. 1995) ...................................................................30

*In re UNR Indus.,*
    30 B.R. 609 (Bankr. N.D. Ill. 1983) .......................................................................22

*In re V. Savino Oil & Heating Co.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) .....................................................................23

*In re White Plains Dev. Corp.,*
    137 B.R. 139 (Bankr. S.D.N.Y. 1992) ...................................................................27

*In re Woodson,*
    839 F.2d 610 (9th Cir. 1988) ..................................................................................23

## Statutes

11 U.S.C. §1112(b)(1) ...................................................................................................18

Breakers Capital LLC ("Breakers"), by its counsel Rubin LLC, hereby submits this motion, pursuant to section 1112(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), for entry of an order converting this chapter 11 case filed by Solera Holdings L.L.C. (the "Debtor" or "Solera Holdings") to a case under chapter 7 of the Bankruptcy Code. In support thereof, Breakers respectfully represents and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a single asset real estate case. When Solera Holdings commenced this case on July 23, 2013, one day before Breaker's adjourned foreclosure sale, it did not own a single dollar--either cash on hand or in the bank. This is disturbing because (a) Solera Holdings is only a real estate holding company, (b) it did not make any payments on account of real estate taxes or water and sewer charges since January 15, 2010, or on account of it mortgage loan since it matured on January 15, 2012; (c) it reported in its statement of financial affairs that it did not make any payments to any creditors within 90 days of its bankruptcy filing or any payments to insider creditors within one year of its bankruptcy filing; and (d) it has reported that its primary tenant pays property expenses under a triple net lease. Accordingly, the Debtor should have been flush with cash when it filed this case.

2.      But a pervasive conflict of interest infects this case. The Debtor's main tenant, Solera Corp., a restaurant which occupies seventy percent (70%) of the space in the Debtor's property and whose rent obligation as reported by the Debtor constitutes over eighty percent (80%) of the Debtor's reported anticipated income, is controlled by Rufino Lopez, the majority owner of the Debtor. Mr. Lopez has essentially allowed his restaurant to operate without meeting its payment obligations to the Debtor, to the detriment of the Debtor and its estate. It also appears that Mr. Lopez allowed Solera Corp.'s lease with the Debtor to lapse. Mr. Lopez has not

2

taken any enforcement action against Solera Corp., despite demands from Breakers that Debtor do so. In short, in breach of its fiduciary obligations as a debtor-in-possession, the Debtor is not treating its primary tenant and source of income the way any landlord dealing at arm's length would treat a tenant who has not paid rent and whose lease term expired. Mr. Lopez, in breach of his duty of loyalty, has engaged in self-dealing and simply cannot be trusted to enforce the Debtor's rights against his own company.

      3.    Furthermore, according to the Debtor's Schedules (defined hereafter), Mr. Lopez and Solera Corp. allegedly hold, collectively, more than seventy-five percent (75%) in amount of the unsecured claims in this case. But in its operating report, the Debtor described its lease with Solera Corp. as a "triple net lease." It is therefore difficult to understand how the Debtor could have owed Solera Corp. the sum of $232,000 as of the filing date as reported in the Debtor's Schedules, especially given the failure to pay real estate taxes since January 15, 2010. One cannot expect Mr. Lopez to scrutinize and, if appropriate, challenge the bona fides of his own or Solera Corp.'s claims objectively, the way the law requires a fiduciary to behave.

      4.    In further breach of its fiduciary obligations, the Debtor belatedly filed only one operating report between the July 23, 2013 filing date and December 31, 2013, which was deficient. In violation of its obligations to Breakers, which holds an assignment of property rents, the Debtor has not disclosed the amount of rents it has collected during the post-petition period, from whom, or where the rents are being held. The Debtor has also not disclosed in its statement of financial affairs the amount of revenue it collected in 2012. The Debtor's sole operating report states that Solera Corp. is paying the expenses of the Debtor's property. The Debtor is merely a shell having no operations, no employees and no reported cash, and its primary function has been to permit Solera Corp. to operate its business without paying rent or taxes.

5.      Mr. Lopez's personal financial situation has also clearly distracted him. Since July 2013, he has filed with this Court two cases under chapter 13 of the Bankruptcy Code. Mr. Lopez selected as his counsel for those cases Lawrence Morrison, Esq., the same attorney whom Mr. Lopez has accused, in filings with this Court, of not informing him of the terms of a stipulation that Mr. Morrison signed on behalf of Mr. Lopez, the Debtor and Solera Corp. in Breaker's state court action against them.  Mr. Lopez also accused Mr. Morrison of signing the stipulation on behalf of a litigant whom Mr. Lopez claims Mr. Morrison did not represent.  Mr. Lopez's retention of Mr. Morrison even after he accused Mr. Morrison of blatant attorney misconduct raises another serious question regarding Mr. Lopez's trustworthiness and honesty with this Court.   It is not plausible that Mr. Morrison signed a stipulation waiving Mr. Lopez's substantive rights without Mr. Lopez's knowledge and permission to do so, but that Mr. Lopez then promptly turned around and re-hired Mr. Morrison to file another bankruptcy case on his behalf.

6.      Cognizant of the implications of Bankruptcy Code Section 362(d)(3) for this case, to avoid having to make any post-petition payments to Breakers, on the ninetieth day after filing this case, the Debtor filed with this Court a bare-bones plan of reorganization without a disclosure statement and without anything at all to support the Debtor's capability of implementing that plan. The Debtor never filed a disclosure statement for that plan and never took any steps toward trying to get that plan confirmed.  Not surprisingly, that proposed plan, which proposes to pay unsecured creditors only twenty percent of their claims in three annual payments beginning one year after confirmation, does not include any provision for the pursuit of claims held by the Debtor against Solera Corp. for unpaid rent or other amounts due.

4

7.     The Debtor's pattern of conduct is most troubling.  The Debtor is unwilling or incapable of fulfilling its fiduciary obligations to behave as a debtor-in-possession entrusted with property in which a secured creditor holds an interest.

8.     For these reasons, this case should be converted to one under chapter 7 of the Bankruptcy Code.

## STATEMENT OF FACTS

### A.     Mr. Lopez Controls Both the Debtor and its Primary Tenant

9.     On July 23, 2013 (the "Petition Date"), Solera Holdings filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Solera Holdings owns the real property located at 216 East 53rd Street, New York, New York (the "Property") consisting of a four-story plus cellar, walk-up commercial-use building.

10.     Rufino Lopez is the managing member and majority owner of the Debtor. *See* Debtor's Statement of Financial Affairs filed with this Court on August 20, 2013 (the "SOFA") [Doc. No. 12], Answer to Question 21(b)(copy annexed as Exhibit A to the accompanying declaration of Paul A. Rubin dated January 10, 2014 (the "1-10-14 Rubin Decl.").  Mr. Lopez also identified himself as the managing member of the Debtor's primary tenant, Solera Corp. *See* Affidavit of Rufino Lopez filed this Court on September 13, 2013 [Doc. No. 17, p.3., ¶ 1] (Ex. B to Rubin Decl.).  Solera Corp. is the entity through which Mr. Lopez operates a restaurant at the Property, utilizing the ground floor, second floor and cellar levels. *See* Debtor's Operating Report filed on October 18, 2013 [Doc. No. 35] at p.9 (Ex. C to 1-10-14 Rubin Decl.).

11.     The Debtor's Property also includes two office units, one per floor, on the third and fourth floors.  The fourth floor is vacant and the third floor is occupied by a month-to-month tenant. *See* Schedule G of Debtor's Schedules of Assets and Liabilities field with this Court on August 20, 2013 (the "Schedules")[Doc. No. 12](Ex. A to 1-10-14 Rubin Decl.).  Rent due

from Solera Corp. constitutes over eight percent (80%) of the Debtor's anticipated monthly rental income. *See* Debtor's Operating Report filed on October 18, 2013 [Doc. No. 35] at p.9 (Ex. C to 1-10-14 Rubin Decl.).

12.    Solera Corp. paid a pre-petition retainer in the amount of $20,000 to Debtor's bankruptcy counsel, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., and Solera Corp. also paid the Debtor's $1,213 chapter 11 filing fee. Lopez 9-13-13 Aff. at ¶1. (Ex. B to 1-10-14 Rubin Decl.).

**B.    The Lease Between Solera Holdings and Solera Corp.**

13.    The expiration date of Solera Corp.'s lease for the basement, ground floor and second floor of the Property was June 30, 2011. *See* Agreement of Lease dated August 29, 1990 between Kenvic Associates as landlord and Solera Corp. as tenant (the "Lease"), copy annexed as Ex. D to 1-10-14 Rubin Decl., Article 1A, p.2.    Solera Holdings became the landlord under the Lease with Solera Corp. no later than October 23, 1996. *See* Second Modification of Lease dated October 23, 1996 between Solera Holdings LLC (as successor to Kenvic Associates) and Solera Corp. (Exhibit E to 1-10-14 Rubin Decl.).

14.    It is not clear whether the term of the Lease was renewed. Article 46 of the Lease contains a renewal option for one five-year term that Solera Corp. had the right to exercise by providing written notice to Solera Holdings at least one year before the expiration of the original term of the Lease.    Article 46 of the Lease further provides that if Solera Corp. did not provide written notice of its exercise of the renewal option, then Solera Holdings "shall give the Tenant a thirty day notice of its right to exercise the option to renew and in the event the Tenant shall fail to exercise its right to renew this Lease, then upon the expiration of the original term, this Lease shall terminate." Ex. D to 1-10-14 Rubin Decl. at p.61.

6

15.    The Lease provides that if the renewal option is exercised, Solera Corp. must pay base rent each year in an amount that is the greater of: (i) the Base Rent due and payable during the last year of the original term or (ii) the fair rental value of the premises, as agreed to by Solera Holdings and Solera Corp. But if the parties could not agree upon the fair rental value of the leased premises for the renewal term, the Lease provides that the fair rental value would be determined through a process involving two appraisers, one selected by Solera Corp. and the other selected by the landlord (i.e., Solera Holdings), and if the two appraisers could not agree on the fair rental value, the appraisers would select a third appraiser whose determination would be binding. *See id.* at 62, ¶ E. (Ex. D to 1-10-14 Rubin Decl.).

16.    Despite requests from Breaker's counsel, Debtor has not provided any documentation demonstrating whether the renewal option was timely exercised in accordance with the terms of the Lease, whether the Lease expired according to its terms on June 30, 2011, or how rent has been calculated since June 30, 2011.

17.    Under the Lease, the premises are rented "as is" and the landlord is generally not required to pay for utility services or to provide any services within the rented space. *See id.* at Article 29, ¶¶ A and B. (Ex. D to 1-10-14 Rubin Decl.).

18.    The Lease also includes an annual rental escalation that increases Solera Corp.'s rental obligations based on increases in the amount of real estate taxes assessed with respect to the Property. *See* Lease, Article 28.   In the only operating report the Debtor filed in 2013, the Debtor describes the Lease as a "triple net lease." (Ex. C to   In other words, the Debtor relies largely upon Solera Corp. for the payment of real estate taxes due with respect to the Property. The Debtor failed to pay pre-petition real estate taxes owed respect to the Property in the amount of $257,102, and pre-petition water and sewer charges in the amount of $27,592. The

7

Debtor has not made any payments of real estate taxes or water and sewer charges at any time since January 15, 2010.

### C.    Information From Debtor's Schedules and Statement of Financial Affairs

19.    On August 20, 2013, the Debtor filed with this Court its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "SOFA") [Doc. No. 12].

20.    Even after taking into account the fact that a portion of the Debtor's outstanding real estate taxes was paid by Breakers' assignor before this case was commenced, the Schedules list a remaining pre-petition obligation of the Debtor for outstanding unpaid pre-petition real estate taxes in the amount of $100,703.48 (*See* Schedule D [Doc. No. 12, p.6])(Ex. A to 1-10-14 Rubin Decl.). The City of New York City Department of Taxation and Finance filed a proof of claim in this case on September 16, 2013 in the amount of $105,376.43 [Claim No. 2].

21.    The Debtor's mortgage loan held by Breakers (described below) matured on January 15, 2012, and the Debtor did not make any payments on account of that pre-petition mortgage debt on or after that date. The Debtor has not made any post-petition payments to Breakers.

22.    According to its Schedule B, despite the Debtor's aforementioned failure to pay pre-petition taxes, water and sewer charges since January 2010 and mortgage debt since January 2012, when the Debtor filed this case on July 23, 2013, it did not have a single dollar on hand and its bank account was empty. (Ex. A to 1-10-14 Rubin Decl., p.3). The Debtor's SOFA do not disclose the amount of income that Debtor collected in 2012. According to the SOFA, the Debtor did not make any payments to any creditors within 90 days of its bankruptcy filing. Debtor's SOFA, Response to Question 3(b) (Ex. A to 1-10-14 Rubin Decl. pp. 15-16).

8

23.    According to the Debtor's Schedule F, as of the Petition Date, Mr. Lopez
held an unsecured claim against the Debtor in the amount of $400,000, and Solera Corp. held an
unsecured claim against the Debtor in the amount of $232,000. (Ex. A to 1-10-14 Rubin Decl.,
p.11). According to the Schedules, these two claims controlled by Mr. Lopez represent seventy-
seven percent (77%) in amount of all unsecured claims in this case, dwarfing all other scheduled
unsecured claims against the Debtor combined.

### D.    The Loan Held By Breakers

24.    The Debtor executed and delivered a Consolidated First Mortgage
Promissory Note dated November 9, 2006 (the "Note") in favor of Breaker's assignor, BPD Bank
("BPD"), evidencing the Debtor's indebtedness to BPD in connection with a loan to Debtor (the
"Loan") the original principal amount of $3,500,000. A copy of the Note is annexed as Exhibit A
to the Declaration of Paul Rubin dated October 3, 2013 previously submitted to this Court in
support of Breaker's motion for adequate protection [Doc. No. 23] (the "10-3-13 Rubin Decl.").

25.    To secure its obligations to BPD pursuant to that note, the Debtor executed
a Consolidated Mortgage and Security Agreement dated November 9, 2006 (the "Mortgage") that
encumbers the Property, which was duly recorded in the New York City Department of Finance's
Office of the City Register for New York County on December 4, 2006 (the "Office of the City
Register") (Ex. B to 10-3-13 Rubin Decl.), together with a Mortgage Consolidation Extension and
Modification Agreement dated November 9, 2006 that was executed and delivered by the Debtor
to consolidate that mortgage with prior recorded mortgages into a single lien (Ex. C to 10-3-13
Rubin Decl.).  The Note was annexed to and recorded with the Mortgage and is also part of the
public record.  The Debtor also delivered to BPD an Assignment of Leases and Rents of the
Property executed by the Debtor in favor of BPD Bank dated as of November 9, 2006 (the

9

"Assignment of Rents"), which was recorded in the Office of City Register on December 4, 2006

(Ex. D to 10-3-13 Rubin Decl.).

    26.    The Assignment of Rents provides, in part:

> KNOW ALL MEN BY THESE PRESENTS THAT
> as of the 9th day of November 2006, SOLERA
> HOLDINGS, L.L.C. . .hereby conveys, transfers
> assigns unto Assignee [BPD], its successors and
> assigns, all of the rights, interests and privileges: (A)
> which Assignor [Debtor] as lessor has and may have
> in the leases, subleases, contracts, licenses or other
> agreements now existing or hereafter made and
> affecting the use and/or occupancy of the Mortgaged
> Property . . . by any lessee, or any part thereof, as any
> such document may have been, or may from time to
> time be hereafter modified, extended, and renewed
> (all of the foregoing rights, interests and privileges
> being collectively referred to as the "Leases") . . .
>
> TOGETHER with all rents, income security deposits
> and profits arising from said Leases and renewals
> thereof, if any (collectively, the "Rents") . . . .
>
> This is an absolute, unconditional, present and true
> Assignment (and not pledged as security) and is
> made in connection with the following:   (i) the
> obligations of Assignor under a certain Note (the
> "Note") between Assignor and Assignee dated
> NOVEMBER 9, 2006, as the same may be amended,
> restated, replaced or modified from time to time . . .
> evidencing a loan in the principal amount of THREE
> MILLION FIVE HUNDRED THOUSAND and
> 00/100 DOLLARS ($3,500,000) (the "Loan"), and
> all   increases,   extensions,   amendments   or
> modifications of the Loan, and all additional loans
> made hereafter, if any, by Assignee to Assignor or its
> successors and assigns....

    27.    The Note and Mortgage were subsequently modified by (a) a Modification

Agreement dated as of November 9, 2009 recorded in the Office of the City Register on January 28,

2010 (attached to which was an Amended Note in the amount of $3,500,000, executed by Debtor,

10

extending the term of the subject loan to February 9, 2010); and (b) a Modification Agreement dated as of December 10, 2010.), (Ex. E to 10-3-13 Rubin Decl. which was recorded in the Office of the City Register on December 22, 2011, annexed to which was a Modified and Restated Note in the amount of $3,500,000, executed by Debtor so as to, among other things, extend the maturity date of the subject loan to January 15, 2012. (Ex. F. to 10-3-13 Rubin Decl.).

### E. Events Leading Up to Execution of the July 17, 2013 Stipulation That Mr. Lopez Claims Was Signed By Attorney Morrison Without Mr. Lopez Knowing its Terms

28.     Debtor failed to repay the Loan when it matured.  On or about May 10, 2012, BPD commenced an action against the Debtor and others (the "State Court Action") with respect to the Property in the Supreme Court of the State of New York for the County of New York (the "State Court").

29.     Pursuant to an Assignment of Mortgage dated May 31, 2012 that was recorded in the Office of the City Register on July 12, 2012, BPD assigned to Breakers all of its right, title and interest in and to the Mortgage and the note secured thereby. (Ex. G to 10-3-13 Rubin Decl.).  Pursuant to an Assignment of Assignment of Leases and Rents also dated May 31, 2012 and also recorded in the Office of the City Register on July 12 2012, BPD assigned to Breakers all of its right, title and interest under the Assignment of Rents. (Ex. H to 10-3-13 Rubin Decl.).

30.     On January 8, 2013, Justice Carol E. Huff of the State Court signed an order which granted a default judgment against all defendants in the State Court Action. *See* Affidavit of Edward S. Feldman Submitted:  (1) in Further Support of Breakers Capital LLC'S Application to Take a Rule 2004 Examination of Debtor and (2) in Opposition to Debtor's Application to Hold Breakers Capital LLC in Contempt of Court sworn to on October 16, 2013 (the "Feldman Aff.")

11

[Doc. No. 33] at ¶ 13 and Ex. A thereto. (A copy of the Feldman Aff. including exhibits thereto is annexed as Ex. F to the Rubin 1-10-14 Decl.).

31.    On March 19, 2013, Lawrence Morrison, Esq. filed a proposed Order to Show Cause on behalf of the Defendants in the State Court Action. On April 24, 2013, Mr. Morrison filed a revised proposed order to show cause seeking to vacate the January 8, 2013 Order. *See* Feldman Aff. at ¶ 17.

32.    On June 6, 2013, the State Court entered an order denying the application filed by Mr. Morrison seeking to vacate the January 8, 2013 Order. *See id* at 18.

33.    On June 6, 2013, the State Court signed an Order and Judgment in favor of Breakers in the amount of $4,718,891.22 together with interest thereon accrued from and after January 13, 2013 (the "Judgment") (Ex. G to 1-10-14 Rubin Decl.). The Judgment authorized a public auction foreclosure sale of the Property under the direction of an appointed referee, Paul R. Sklar, Esq. Feldman Aff. [Doc. No.33] at ¶19.

34.    A foreclosure sale of the Property was scheduled to proceed on July 17, 2013. But Lawrence Morrison Esq. contacted Breaker's foreclosure counsel, Edward Feldman, Esq., and on that date, Mr. Morrison and Mr. Feldman executed a stipulation on behalf of their respective clients (the "July 17, 2013 Stipulation") which recited that "Defendants have requested an adjournment of the sale for one week in order to complete a private sale of the Property." (Ex. H to 1-10-14 Rubin Decl. at p.1, ¶ C); (also included as Ex. D to Feldman Aff.). Pursuant to that stipulation, Breakers agreed to adjourn the sale until July 24, 2013, and the Debtor agreed to pay Breakers the sum of $20,000 and to withdraw with prejudice the notice of appeal it had filed in the State Court Action from the judgment entered by the State Court in favor of Breakers. (Feldman Aff. at ¶29 and Ex. D thereto). But for the execution of the July 17, 2013 Stipulation, the

12

foreclosure sale of the Property would have proceeded on that date. Debtor and the other defendants acknowledged in that Stipulation that "there is no defense to this action nor grounds to overturn the aforesaid Judgment" entered by the State Court. (Feldman Aff. at ¶31 and Ex. D thereto).

35.    Notably, Mr. Morrison signed the July 17, 2013 Stipulation on behalf of all defendants in the State Court Action, and the Stipulation recites that "The Morrison Law Office, P.C. has previously filed applications on behalf of all Defendants and hereby confirms that it has and is appearing as attorneys of record for all Defendants." (Ex. D to Feldman Aff., a copy of which is annexed as Ex. F to the 1-10-14 Rubin Decl.).

36.    The Debtor did not complete a private sale of the Property. Instead, on July 23, 2013 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

37.    The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed.

38.    On September 12, 2013, the Debtor filed an objection to Breakers' motion to take Rule 2004 discovery of the Debtor, and stated therein the following regarding the July 17, 2013 Stipulation: "The Debtor never viewed this agreement, neither knew of its terms when it made [the $20,000] payment . . . ." [Doc. No. 15 at ¶ 6]. (Ex. I to Rubin 1-10-14 Decl.).

39.    Similarly on October 21, 2013, Mr. Lopez filed with this Court a Declaration [Docket No. 39-1] in which he stated that his lawyer (Mr. Morrison) told him on July 16, 2013 that Breakers agreed to adjourn the foreclosure sale in return for a $20,000 payment but that he [Mr. Lopez] was not aware of the provisions in the July 17, 2013 Stipulation which

waived the appeal in the State Court Action and which provided that the $20,000 represented payment for a an adjournment of the foreclosure sale, not a pay down. [Docket No. 39-1 at ¶23]. (Ex. J to 1-10-14 Rubin Decl.).

40.    Mr. Lopez also filed with this Court an Amended Declaration dated October 22, 2013 in which he asserted that neither he nor the Debtor agreed to the terms of the July 17, 2013 Stipulation. [Docket No. 41 at ¶24]. (Ex. K to 1-10-14 Rubin Decl.). Mr. Lopez further stated in that Amended Declaration that, to the best of his knowledge, Mr. Morrison never represented defendant Christopher Villano in the State Court Action, even though the stipulation says that Mr. Morrison represented all of the Defendants in the State Court Action. *See id.* at ¶ 22.

## F.    Mr. Lopez Filed Two Personal Bankruptcy Cases and Selected Mr. Morrison as His Counsel Each Time

41.    On July 16, 2013, Mr. Lopez filed with this Court a voluntary petition for relief under Chapter 13 of the Bankruptcy Code (Case No. 13-23188)(RDD). That case was dismissed by order of this Court dated August 22, 2013 granting Mr. Lope's *ex parte* motion to dismiss it. Mr. Lopez was represented in that case by Lawrence Morrison, Esq.

42.    Since Mr. Lopez alleged in this Court under penalty of perjury multiple times that Mr. Morrison signed the July 17, 2013 Stipulation without informing Mr. Lopez of, and obtaining his consent to, its terms, and that Mr. Morrison signed that stipulation on behalf of Mr. Villano without authority to do so, one might have expected Mr. Lopez to file a complaint against Mr. Morrison with the Appellate Division's departmental disciplinary committee. But tellingly, Mr. Lopez elected to utilize the services of Mr. Morrison as his personal attorney once again. On October 21, 2013, Mr. Lopez filed with this Court another voluntary petition for relief under chapter 13 of the Bankruptcy Code (Case No. 13-23730)(RDD), once again using Mr. Morrison as his bankruptcy counsel. That case was dismissed by order of this Court dated November 18,

14

2013 granting the *ex parte* motion filed by Mr. Morrison on November 15, 2013 seeking dismissal of that case as well.

### G.   The Debtor's Lack of Reporting Regarding the Rents, Despite Breakers' Efforts

43.   On October 18, 2013, the Debtor belatedly filed with this Court an operating report for the period from July 23, 2013 (the Petition Date) through August 31, 2013 [Doc. No. 35]. (Ex. C to 1-10-14 Rubin Decl.). That report--the only operating report filed by the Debtor in this case--discloses that the Debtor collected rental income from the Japan Executive Club during the reporting period in the amount of only $4,000 (*See id.* at p.3), that the Debtor did not collect any rent for the reporting period from Solera Corp., and that the Debtor did not have any cash at the beginning or at the end of this reporting period. The Operating Report lists the monthly rent obligation of Solera Corp. at $18,000. *See id.* at p.9. This operating report does not indicate where any rents generated by the Property were or are being held.

44.   Pursuant to the Assignment of Rents (which was separately assigned to Breakers), the rents generated by the Property were absolutely assigned to Breakers before this case was commenced, and accordingly they do not constitute property of the Debtor's estate. Though the Debtor contests this point, at a minimum the rents generated by the Property would constitute Breakers' cash collateral that the Debtor could not spend without authorization to do so from either the Court or Breakers and that must be segregated and accounted for. To date, the Debtor has neither sought nor obtained either.

45.   Breakers has made numerous attempts to obtain information regarding the rents and leases of the Property. For example, by letter dated August 14, 2013 to Debtor's counsel (Ex. L to 1-10-14 Rubin Decl.), Breakers' counsel expressed several concerns Breakers has regarding the Debtor's behavior regarding the Property. In that letter, Breaker's counsel advised

15

Debtor's counsel that Breakers has not consented to the use of cash collateral and Debtor was required to segregate all cash collateral and to provide an accounting, and Breaker's counsel requested a rent roll and copies of leases for the Property and a proposed cash collateral budget. Breaker's counsel also requested confirmation that the Debtor would not enter into any new leases or lease amendments without Breaker's prior written consent. In that letter, Breakers also reserved its rights with respect to the question of whether rents generated by the Property constitute property of the Debtor's estate.

46.     By letter dated September 10, 2013 to Debtor's counsel (Ex. M to 1-10-14 Rubin Decl.), still in the dark regarding the Debtor's collection, use and/or deposit of rents, Breakers reiterated its position regarding the rents, requested that the Debtor segregate and account for the rents collected and requested a copy of all leases in effect with respect to the Property.

47.     Shortly before a scheduled hearing on Breaker's motion for adequate protection, the Debtor provided Breaker's counsel a limited number of documents, including a copy of the Lease, but no renewals thereof. By letter dated November 19, 2013 Breaker asked Debtor's counsel to explain what action the Debtor would take against Solera Corp., which, as explained above, appears not to have a lease in place and does not appear to be paying rent or real estate taxes for an extended period of time. (Ex. N to 1-10-14 Rubin Decl.).

48.     Debtor's counsel did not respond to that letter.    By letter dated December 19, 2013, Breakers' counsel followed up with another letter to Debtor's counsel. (Ex. O to 1-10-14 Rubin Decl.). Breakers' counsel noted in this letter that the Debtor had filed only one operating report and it appears that the Debtor has allowed Solera Corp. to continue to occupy the Property without a lease and without paying rent. Breakers' counsel posed the following simple questions to Debtors' counsel:

16

1. How much rent did Solera Holdings collect from Solera Corp. in 2012?

2. How much did Solera Holdings collect from Solera Corp. in 2013 before Holdings filed its bankruptcy case?

3. How much did Solera Holdings collect from Solera Corp. since Holdings filed its bankruptcy case?

4. Does the Debtor have an unexpired written lease with the Tenant and if so, please provide a copy of it.

5. What legal action, if any, has Solera Holdings taken against Solera Corp.?

Debtor's counsel did not answer these questions or provide the requested documentation (such as a lease extension).

49.    On January 2, 2014, Breaker's counsel also inquired as to whether Debtor has paid real estate taxes and water and sewer charges that came due post-petition, but Debtor's counsel has not responded to that inquiry, either.  (Ex. P to 1-10-14 Rubin Decl.).

## H.    The Debtor's Ill-Fated Proposed Plan of Reorganization

50.    The Property constitutes "single asset real estate" within the meaning of Section 101(51B) of the Bankruptcy Code.   On October 21, 2013, which was the ninetieth day following the Petition Date, the Debtor filed a proposed Plan of Reorganization (the "Plan") [Doc. No. 38], but the Debtor did not file a proposed disclosure statement with the Plan or at any time thereafter.   The proposed Plan is scant on details.   It calls for the Debtor to make a payment in the amount of $1,300,000 to Breakers upon an unspecified closing, but there is no indication that the Debtor had or has available such funds or even a commitment to provide funding for the plan.   The Plan also calls for the Debtor to enter into a new lease with an entity called "Kedis Enterprises, LLC," but there is no indication as to the creditworthiness of Kedis Enterprises or that such a lease was actually prepared.   Not surprisingly the Plan does not provide a mechanism for pursuing any

17

claims against Solera Corp. for unpaid rent, or the investigation of the claims of Solera Corp. or Rufino Lopez.

51.     Since filing the Plan, the Debtor never took any steps to try to have it confirmed by this Court. The timing of the filing of the bare-bones Plan, coupled with the Debtor's failure to file a disclosure statement and its failure to take any action whatsoever toward trying to confirm that Plan leads to the inescapable conclusion that the Plan was not file in order to be confirmed, but was filed only so that the Debtor could avoid having to make monthly payments to Breakers in order not to be vulnerable to a motion for relief from the automatic stay pursuant to Section 362(d)(3) of the Bankruptcy Code.

**LEGAL ARGUMENT**

**POINT I**

**CAUSE EXISTS TO CONVERT THE DEBTOR'S
CASE TO A CASE UNDER CHAPTER 7**

A.     **The Applicable Standard**

52.     Bankruptcy Code § 1112(b)(1), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), provides in relevant part:

> [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

Section 1112(b)(1). Cause is a flexible standard, subject to the court's discretion. *In re Products Int'l Co.*, 395 B.R. 101, 107 (Bankr. D. Ariz. 2008). Sixteen illustrative examples of "cause" are listed in § 1112(b)(4), including gross mismanagement of the estate, and the failure to satisfy timely any filing or reporting requirement established by title 11 of the United States Code

18

or by any rule applicable to a case under chapter 11. As the legislative history to § 1112 makes clear, this list of circumstances that constitute cause for conversion "is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H. Rep. No. 95-595, 95th Cong., 1st Sess. 405, reprinted in 1978 U.S. Cong. Code & Admin. News 6361-6362; S. Rep. No. 95-989, 95th Cong., 2d Sess. 117, reprinted in 1978 U.S. Cong. Code & Admin. News 5903. *See also, In re Products Int'l Co.,* 395 B.R. at 107; *In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007); *In re 3 Ram, Inc.,* 343 B.R. 113, 117 (Bankr. E.D. Pa. 2006). Although not enumerated in section 1112(b), lack of good faith also is a valid ground for a finding of cause to convert or dismiss a chapter 11 case. *See In re C-TC 9th Ave. P'ship,* 113 F.3d 1304, 1311 (2d Cir. 1997); *In re 15373 Mem'l Corp. v. Bepco, L.P.,* 589 F.3d 605, 618 (3d Cir. 2009).

        53.    Here, cause exists to convert the Debtor's case.    The following circumstances constitute cause for conversion:

- Mr. Lopez's disabling conflicts of interest, resulting in the Debtor's inability to enforce rights of the estate against Solera Corp., the Debtor's primary tenant and  its main source of rental income, and the Debtor's inability to scrutinize the largest unsecured claims alleged in this case, which are held controlled by Mr. Lopez.

- Mr. Lopez's self-dealing, apparently allowing Solera Corp. to occupy the Property without having a written lease extension, and without paying rent or taxes;

- The Debtor's failure to segregate and account for cash collateral in violation of the Bankruptcy Code;

- The Debtor's failure to timely file operating reports and to make other basic financial disclosures required of a debtor-in-possession;

- The Debtor appears to be nothing but a shell, having no employees or operations, no cash on hand when it filed this case even though it had not paid real estate taxes for well over two years or made mortgage payments for well over one year before the commencement of this case, and Debtor

did not make any payments to any creditors within 90 days of the filing of this case.

- This single asset real estate debtor filed only a bare-bones plan of reorganization on the 90th day after this case was filed, without taking any steps toward confirming the plan. Indeed, the Debtor never bothered to file a disclosure statement with respect to its proposed plan.

- This case bears all of the hallmarks of a "hold-up," a case filed in bad faith. It was filed on the eve of the adjourned foreclosure sale and the Debtor has done little so far except preserve Solera Corp.'s ability to operate in the Property until now without paying taxes or rent while the Debtor continues to evade making any payments to its mortgagee.

Taken together, the totality of the circumstances present highly compelling grounds for the conversion of the Debtor's case and the appointment of a trustee.

54.    The initial burden lies with the movant to establish "cause" for conversion. See 11 U.S.C. § 1112(b)(1); *In re Gateway Access Solutions, Inc.*, 374 B.R. at 561. If the movant establishes cause, the burden shifts to the debtor to prevent dismissal or conversion of the case by demonstrating "unusual circumstances," or demonstrating that it is entitled to the exception outlined in § 1112(b)(2). *In re Products Int'l Co.*, 395 B.R. at 108; *In re Gateway Access Solutions, Inc.*, 374 B.R. at 561. Section 1112(b)(1) does not define "unusual circumstances," however, the phrase contemplates conditions that are not common in chapter 11 cases and that demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding. *In re Products Int'l Co.*, 395 B.R. at 109. Any "unusual circumstances" must be specifically identified by the court in its decision. *Id.*

55.    The exception in § 1112(b)(2) only applies if: "the debtor or another party in interest objects and establishes that - (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if these provisions do not apply, within a reasonable period of time; **and** (B) the grounds for granting such relief [i.e., conversion] include an act or omission of the debtor other than paragraph 4(A),

20

(i) for which there exists a reasonable justification for such act or omission; **and** (ii) that will be cured within a reasonable period of time fixed by the court." Code Section 1112(b)(2) (emphasis added); *In re Gateway Access Solutions, Inc.,* 374 B.R. at 561. If the debtor cannot establish "unusual circumstances," or that it is entitled to the exception outlined in Section 1112(b)(2), the court *shall* convert a chapter 11 case to chapter 7 or dismiss it, whichever is in the best of creditors and the estate.

56.    There are no unusual circumstances in this case militating against conversion, and the exception outlined in § 1112(b)(2) does not apply. There is no reasonable justification for the Debtor's failure to pursue it rights against Solera Corp., for Lopez's self-dealing, including permitting his restaurant to occupy the Property beyond the expiration of its lease and apparently without paying rent or real estate taxes, for the failure to account for any rents collected post-petition or pay post-petition taxes or for the failure to timely file operating reports and to provide information required by the Operating Guidelines of the Office of the United States Trustee. One cannot expect Mr. Lopez to "cure" the acts and omissions creating cause in this matter arising from his conflict of interest, as it is not reasonable to expect that he would take legal action against his own restaurant, seek to evict it, or pursue it for unpaid rent. Moreover, the failure to produce a lease currently in effect and the failure to account for cash collateral were repeatedly raised in letters to the Debtor's counsel, but the Debtor ignored these protests. Thus, as detailed below, the circumstances here mandate conversion and appointment of a trustee.

**B.    The Debtor's Disabling Conflicts of Interest and
Self-Dealing Constitute Cause for Conversion**

57.    Mr. Lopez's disabling conflicts of interest - resulting in the failure to investigate and prosecute lawsuits against Solera Corp. - mandate the conversion of the case and

21

appointment of a trustee. Mr. Lopez's self-dealing also mandates the conversion of the case and appointment of a trustee.

58.    The two recognized policies underlying chapter 11 are preserving going concerns and maximizing property available to satisfy creditors. *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. La Salle St. P'ship,* 526 U.S. 434, 453 (1999)(citing *Toibb v. Radloff,* 501 U.S. 157, 163 (1991). Judge Chapman remarked in *In re Innkeepers USA Trust,* 442 B.R. 227 (Bankr. S.D.N.Y. 2010), "it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate..."

59.    It is well-established that a debtor in possession has a fiduciary duty to preserve and protect estate assets and to maximize the value of the estate for the benefit of its creditors. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir. 2003) (en banc); *In re Marvel Entm't Group,* 140 F.3d 463, 474 (3rd Cir. 1998); *In re Haluz, Inc.,* 665 F.2d 213, 217 (8th Cir. 1981); *Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.),* 227 B.R. 606, 612 (S.D.N.Y. 1998); *In re Nautilus of New Mexico, Inc.,* 83 B.R. 784, 789 (Bankr. D. N.M. 1988); *In re Four Square Broad., Inc.,* 77 B.R. 404, 407 (Bankr. W.D.N.Y. 1987); *In re Russell,* 60 B.R. 42, 47 (Bankr. W.D. Ark. 1985); *In re UNR Indus.,* 30 B.R. 609 (Bankr. N.D. Ill. 1983).

60.    A debtor in possession bears essentially the same fiduciary obligation to creditors as a trustee. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985); *Cybergenics Corp.,* 30 F.3d at 573; *In re Russell,* 60 B.R. at 47. "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Weintraub,* 471 U.S. at 355 (*citing Wolf v. Weinstein,* 372 U.S. 633, 651 (1963)). "As a *de jure*

22

trustee, the debtor in possession holds its powers in trust for the benefit of creditors." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 524-525 (Bankr. E.D.N.Y. 1989).

61.    The nature of the fiduciary duty owed by a debtor-in-possession to its creditors is analogous to the corporate fiduciary duties owed by directors to shareholders under state law and includes the duties of care and loyalty. *In re Bellevue Place Assocs.,* 171 B.R. 615, 624 (Bankr. N.D. Ill.) (*citing Fulton State Bank v. Schipper (In re Schipper),* 933 F.2d 513, 515 (7th Cir. 1991)), aff'd, 1994 U.S. Dist. LEXIS 17409 (N.D. Ill. Dec. 6, 1994).    A debtor in possession is bound by a duty of loyalty that includes an obligation to refrain from self-dealing, and to avoid conflicts of interest and the appearance of impropriety. *See In re Bellevue Place Assocs.,* 171 B.R. at 624; *In re San Juan Hotel,* 847 F.2d 931, 950 (1st Cir. 1988).    As a fiduciary, a debtor in possession is "required to turn square corners and avoid conduct that would prejudice the rights of those whose interests he is required to protect." *In re Woodson,* 839 F.2d 610, 614 (9th Cir. 1988).

62.    Every debtor must be controlled by someone willing to fulfill the fiduciary obligations of a debtor in possession, which means the person must act at all times with undivided loyalty, refrain from engaging in self-dealing, and act free of conflicts of interest.    The debtor in possession may not act solely on its self-interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary obligation to protect. *In re Bellevue Place Assocs.,* 171 B.R. at 624. The United States Supreme Court has noted that: ". . . bankruptcy causes fundamental changes in the nature of corporate relationships.    One of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Weintraub,* 471 U.S. at 355.    An individual who continuously allows his self-interest to interfere with his carrying out the fiduciary obligations of a debtor-in-possession should not be permitted to function as a debtor-

23

in-possession. "A trustee will be appointed when the debtor-in-possession is incapable of performing his fiduciary duties." *In re Russell*, 60 B.R. at 45 (collecting cases).

        63.    It is well-settled that conflicts of interest, especially those resulting in the debtor's failure to investigate and pursue claims, constitute cause for removal of a debtor-in-possession and the appointment of a trustee. *See, e.g., Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1135-36 (10th Cir. 1988) (affirming bankruptcy court's appointment of trustee where the debtor was making no serious effort to collect from affiliated companies and the debtor was in the awkward position of having to decide whether or not to sue itself) (collecting cases); *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 390-91 (Bankr. D. Del. 2001) (concluding that appointment of a trustee was mandated because of the inability of management to investigate and prosecute potential causes of action held by the debtor); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (chapter 11 trustee appointed where debtor was not in a "strong posture" to pursue possible claims due to a conflict of interest and fraudulent transfers, and a "trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 176-177 (Bankr. E.D. Pa. 1984) (an independent trustee was needed to protect the interests of creditors when "an obvious conflict of interest exists in the management of the two [ ] corporations because the officers and principals of the parent corporation are the same individuals as the officers and the principals of the debtor."); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bank. W. Va. 1980) (appointing trustee where "[t]he magnitude of the number of inter-company transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating

and pursuing inter-company claims on behalf of [the debtor]."). *See also In re Euro American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007)(where chapter 11 debtor and its management suffer from material conflicts of interest, an independent trustee should be appointed).

64.     Furthermore, in *In re Tel-Net Hawaii, Inc.,* 105 B.R. 594 (Bankr. D. Hawaii 1989), the court found that the controlling shareholder might be liable for certain pre-petition payments made by the Debtor of liabilities that the controlling shareholder had guaranteed. *Id.* at 595. Not surprisingly, the controlling shareholder had not made any effort to cause the Debtor to recover these preferential transfers from the controlling shareholder. *Id.* The court held that the controlling shareholder's conflicting loyalties dictated the appointment of a trustee because, "[t]he debtor's principal shareholder is in no position to exercise undivided loyalty to the rights of all interested parties." *Id.* at 595 (quoting *In re Natural Plants & Land Mgmt C.o., Ltd.,* 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986)).

65.     The court in *In re Nautilus of New Mexico, Inc.,* held that a debtor controlled by a husband and wife cannot be expected to pursue a recovery against the husband. 83 B.R. at 789. The *Nautilus* Court stated it was irrelevant that the movant did not establish all of the elements of the claim they accused the debtor of failing to commence. *Id.* It was sufficient that the movants established a conflict of interest and facts supporting the potential claim that should be investigated. The court held that appointment of an independent trustee to investigate the transfers in question was in the best interests of the estate because the debtor's principal was incapable of dealing with the debtor as a fiduciary. *Id.*

25

66.    Significantly, the Third Circuit addressed this issue in *Cybergenics* and explained that a debtor's management really cannot be expected to pursue claims contrary to the manager's self-interest.

> This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor-really, the debtor's management-bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it.

*Cybergenics*, 330 F.3d at 573.  The court in *In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (Bankr. S.D. Ga. 1990) echoed the same sentiment:

> In short, the obligation to maximize recovery for the benefit of unsecured creditors by the pursuit of these preferences against close family members, who may well feel morally entitled to the money, flies in the face of human nature and that fact alone is enough to show that impartiality and aggressiveness of the Debtor's officers may be called into doubt at a later time.

*Id.* at 325 (emphasis added).  Or, as summarized by another Bankruptcy Court:

> It is unreasonable to suppose that the debtor-in-possession would choose to sue himself.

*In re Russell*, 60 B.R. at 48.

67.    Here, Mr Lopez is in no position to exercise undivided loyalty on behalf of the Debtor's estate.  As noted above, the law requires that every debtor must be controlled by someone willing to fulfill the fiduciary obligations of a debtor in possession, which means the person must act at all times with undivided loyalty, refrain from engaging in self-dealing, and act free of conflicts of interest.  Mr. Lopez has demonstrated that he is unable to fulfill the fiduciary obligations of a debtor in possession, and it would be unreasonable to expect that he could.  This case is rife with conflicts of interest and self-dealing.  He seems to think that it is his prerogative

26

to allow Solera Corp. to operate without having timely exercised the renewal option in the Lease and without paying rent to Solera Holdings. This situation cannot be remedied by a court order directing Mr. Lopez to enforce the estate's rights against Solera Corp. Mr. Lopez simply cannot be expected to pursue such claims with any vigor. *See In re Fiesta Homes,* 125 B.R. at 325 (finding the pursuit of claims against close family members flies in the face of human nature).

68.     Mr. Lopez's conflicts and self-dealing are further evidenced by the Plan he signed and filed for the Debtor. He has proposed to pay unsecured creditor twenty percent (20%) of their allowed claims over three years beginning one year after confirmation, without any mechanism for investigation or pursuit of potential claims against Solera Corp. for unpaid rent or other amounts it may owe to the Debtor. While the Plan calls for the waiver of claims held by Mr. Lopez and Solera Corp., there is no provision for an independent, objective investigation of the bona fides of any such claims. Clearly, Mr. Lopez is using the Debtor to serve his own personal interests and without attempting to maximize value for the Debtor's estate. This type of behavior mandates conversion and appointment of a trustee.

### C.    The Debtor's Failure to Account for Cash Collateral Also Constitutes Cause For Conversion

69.     Bankruptcy Code § 363(c)(2) provides that a debtor in possession may not use cash collateral unless it first obtains the consent of the affected secured creditor or an authorization from the bankruptcy court. Code Section 363(c)(4) requires a debtor to segregate and account for any cash collateral that it does not have the consent of the creditor or authority from the court to use, sell or lease. *In re White Plains Dev. Corp.*, 137 B.R. 139, 142 (Bankr. S.D.N.Y. 1992).

70.     The failure to segregate and account for cash collateral is serious offense. As one court explained:

27

> The Bankruptcy Code could not be more explicit as to the
> duty imposed upon a debtor-in-possession to account for a
> creditor's cash collateral.    A debtor-in-possession is
> absolutely prohibited from using cash collateral unless it
> obtains the consent of the affected secured creditor or an
> authorization from the bankruptcy court.  In the absence of
> such consent or authorization, a debtor-in-possession is
> under an absolute obligation to segregate and to account for
> all such cash collateral.  These principles are not subject to
> dispute.

*In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 768-69 (Bankr. E.D. Tex. 2001).

Here, Breakers was entitled to timely reporting regarding any and all rents collected by the Debtor since the Petition Date and the Debtor has no valid excuse for its failure to provide timely reporting of any Property rents in its possession.  "If corporate officers cannot be held responsible for the acts or omissions of a corporate debtor-in-possession, then there are no responsible parties . . . ." *Id.* at 772. *See also, In re A-1 Specialty Gasolines, Inc.*, 246 B.R. 445, 450 (Bankr. S.D. Fla. 2000) ("[T]he the protections afforded by Section 363(c) are sufficiently important to warrant a finding of contempt when the provision is violated.  To hold otherwise would be to allow debtors-in-possession to violate Section 363(c) unless and until the court enters an order effectuating the Code provision.").

71.    The court in *Green River Prod. Credit Assoc. v. Alvey (In re Alvey)*, 56 B.R. 170 (Bankr. W.D. Ky. 1985) also underscored the serious nature of Debtor's obligation to handle and report on cash collateral as required by the Bankruptcy Code:

> There can be no serious debate as whether a Chapter 11
> debtor in possession owes a fiduciary duty to his creditors.
> Under the Bankruptcy Code the DIP is vested with all of the
> powers and duties of a trustee, 11 U.S.C. § 1107, and must
> be held to the high standards of accountability that title
> connotes.  Implicit in the DIP's acceptance of the
> appointment is the complete subordination of his property to
> the legitimate claims of his creditors. That submissive
> posture is part of the price he pays for federal court
> protection through the reorganization process.

28

> Relinquishment of personal control over the disposition of property is absolutely essential to the preservation of those creditors' rights already materially impaired-or at least deferred-by the Chapter 11 filing. The DIP who disposes of property of the Chapter 11 estate without first obtaining court approval does so at this [sic] peril.
>
> This is particularly true where the property disposed of is subject to a secured claim. The secured creditor has not a simple money demand but <u>a property right enjoying a protection of federal constitutional rank</u>, a far higher degree of protection than that enjoyed by the DIP.
>
> The debtor's complete respect for secured property rights is commanded by the Bankruptcy Code. Section 363(c) requires either creditor consent or prior court approval to use cash collateral, and in the well-managed Chapter 11 case the "motion to use cash collateral" is the very first pleading to be filed by the highly-leveraged debtor.

*Id.* at 172 (emphasis added).

72.     Here, post-petition the Debtor has been collecting rents without reporting how much it has collected or where the money is being held. The extent to which the Debtor has collected rents is unknown due to the Debtor's failure to comply with the disclosure requirements applicable to all debtors-in-possession.

**D.      The Debtor's Failure to File Operating Reports Constitutes Further Cause for Conversion**

73.     The Debtor has violated 11 U.S.C. § 1112(b)(4)(F), which requires a debtor to timely comply with its reporting requirements. *See In re Landmark Atlantic Hess Farm, LLC*, 2011 WL 831724 (Bankr. D.Md. March 3, 2011)(finding cause to convert or dismiss case when the debtor failed to file operating reports in a timely manner). *See also In re Roma Group. Inc.*, 165 B.R. 779, 780 (Bankr. S.D.N.Y. 1994)("The failure to file monthly operating statements . . . undermines the Chapter 11 process and constitutes cause for dismissal or conversion of Chapter 11 proceedings.").

29

74.    "To reap the benefit of chapter 11, the debtor must pay the price of disclosure; he or she needs to provide financial and other relevant information to the creditors to inform them and the Court about the progress and status of the case." *In re Tornheim*, 181 B.R. 161, 164 (Bankr. S.D.N.Y. 1995).

> Neither the court nor creditors should have to coerce or implore a debtor into fulfilling the obligations imposed upon it. Quite to the contrary, when a debtor seeks protection from its creditors, it is constrained to observe both the letter and the spirit of the orders granting it protection and allowing it to operate unless and until it seeks and obtains a modification of those orders. ***Timely and accurate financial disclosure is the life blood of the Chapter 11 process.*** Monthly operating reports are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it to do something. They are the means by which creditors can monitor a debtor's post-petition operations. As such, their filing is very high on the list of fiduciary obligations imposed upon a debtor in possession.

Id. (citations omitted) (emphasis added). "Refusal or inability to provide financial disclosure sounds the death knell of a chapter 11 case." *Tornheim*, 181 B.R. at 164. The Debtor's failure to timely file its operating reports, and its failure to provide information required under the Operating Guidelines of the United States Trustee's Office, has been compounded by the Debtor's stonewalling of Breakers' repeated requests for financial information that every debtor should be prepared to provide in a timely manner without hesitation.

### E.    The Debtor's Gross Mismanagement of the Estate Constitutes Further Cause for Conversion

75.    The failure of a debtor to properly report income and expenses constitutes evidence of "gross mismanagement" under Code Section 1112(b)(4)(B). *In re Halal 4 U LLC*, 2010 WL 3810860, *4 (Bankr. S.D.N.Y. Sept. 24, 2010). Failure to file and pay taxes pre-petition is also gross mismanagement justifying the appointment of a trustee. *In re Great Ne. Lumber & Millwork Corp.*, 20 B.R. 610, 612 (Bankr. E.D.Pa. 1982)(determining that the debtor's failure to

file and pay its sales taxes for the past six years constitutes such gross mismanagement of the debtor's affairs before the commencement of the case as to constitute cause for the appointment of a trustee). In *In re Evans,* 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985), the court recognized the failure to file tax returns, coupled with a debtor's refusal to investigate potential preferential transfers, as breaches of fiduciary duty necessitating the appointment of a trustee. The debtor there could not be trusted to protect the interests of the estate where the debtor failed to file post-petition tax returns for the estate and failed to investigate possible preferential transfers. *Id.* at 48. The potential harm to the unsecured creditors of the estate by reason of these failures was deemed to be conclusive evidence of detriment to the estate. *Id.* at 49.

76.    Here, the Debtor's gross mismanagement of its assets and estate is evidenced by its failure to pursue Solera Corp. for unpaid rent or taxes and its failure to seek to evict Solera Corp., its failure to timely report revenue collected and expenditures made for the estate, its failure to timely report the amount and location of rents collected post-petition, and the failure to pay pre- and post-petition real estate taxes.

## F.    Cause Also Exists Because This Case Bears the Hallmarks of a Filing For an Impermissible Purpose

77.    In this case, the factors of an impermissible filing identified by the Second Circuit in *CT-C 9th Ave.*, 113 F.3d at 1312 are present:  The Debtor has only one asset, few unsecured creditors, the unsecured claims are dwarfed by Breakers' secured claim, the Debtor's Property was the subject of a state court foreclosure action, the Debtor's financial problems involve a two-party dispute that can be resolved in the pending state court action, the timing of the filing evidences an intent to frustrate Breaker's right to enforce its rights, the Debtor has not paid Property taxes and related charges, the Debtor has no employees, and the Debtor filed a Plan that it never sought to try to confirm.

* * * * *

78.   In sum, Mr. Lopez's disabling conflicts of interest, self-dealing, failure to account for cash collateral in violation of the Bankruptcy Code, gross mismanagement, each justify conversion and appointment of a trustee.   When these circumstances are considered together with the Debtor's failure to timely disclose the amount of rents collected in 2012 and how much rent was collected from Solera Corp. before and after the Petition Date, the Debtor's failure to timely file operating reports, the filing of this case on the eve of the adjourned foreclosure sale, the filing of a bare-bones plan on the 90th day after the Petition Date without a disclosure statement and the Debtor's failure to take any steps toward trying to confirm that plan, the only conclusion is that there exists abundant cause to convert this case.   Taken together, these circumstances cry out for the conversion and the appointment of a trustee.   When viewed in the totality of the circumstances, it is clear that this Debtor's post-petition conduct lacks good faith and the Debtor should not be permitted to take advantage of the benefits of chapter 11. *See, e.g., In re Prisco Props., LLC*, 2010 WL 4412095, *5 (Bankr. D.N.J. Nov. 1, 2010) ("While many of the problems cited in this opinion standing alone might appear de minimus, the confluence paints a picture of a Debtor that is incapable of taking its fiduciary responsibilities seriously.   That is cause for conversion or dismissal.").

## POINT II

### CONVERSION OF THE DEBTOR'S CASE TO A CASE UNDER CHAPTER 7 IS IN THE BEST INTERESTS OF CREDITORS AND THE ESTATE

79.   Once cause is demonstrated, the court must determine whether conversion or dismissal is in the best interests of creditors and the estate.   In making this determination, courts consider: (i) whether a trustee is necessary to investigate and pursue the estates claims; (ii) whether the debtor would simply refile another case upon dismissal; and (iii) whether the debtor engaged

32

in misconduct such that creditors need a chapter 7 trustee to protect their interests. *See Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.),* 14 F.3d 240, 243 (4th Cir. 1994)(vacating dismissal order and remanding with instructions to consider whether conversion in best interest of creditors where the estate had significant avoidance actions); *In re PRS Ins. Group,* 274 B.R. at 389 (appointing trustee to investigate avoidance claims in the best interest of creditors); *In re Tel-Net,* 105 B.R. at 595 (same); *In re Evans,* 48 B.R at 49 (same); *In re Staff Inv. Co.,* 146 B.R. 256, 261-62 (Bankr. E.D. Cal. 1992) (in revoking prior order of dismissal, court found that the debtor had refiled new chapter 7 case after dismissal and that this action was contrary to the interests of a secured creditor); *In re Mobile Freezers, Inc.,* 146 B.R. 1000, 1005-08 (S.D. Ala. 1992), *aff'd,* 14 F.3d 57 (11th Cir.), *cert. denied,* 513 U.S. 807 (1994) (reversing bankruptcy order and remanding with instructions to convert case to chapter 7 where debtor's management had engaged in misconduct).

80.    Here, all these factors favor conversion and appointment of a trustee. A chapter 7 trustee could investigate and pursue claims by against and by Solera Corp. that Mr. Lopez will not, and would otherwise protect the interests of creditors by acting with undivided loyalty and free of conflicts of interest, something Mr. Lopez cannot do. Mr. Lopez has alleged that in October 2012, the Debtor had entered into a contract to sell the Property for $4.2 million (Lopez Amended Declaration at ¶12 [Doc. No. 41])(Ex. K to 1-10-14 Rubin Decl.), which is well below the amount of Breaker's Judgment A chapter 7 trustee could conduct his or her independent evaluation of the Property and determine whether it is worthwhile for the estate to administer it, without consideration of Mr. Lopez's desire to continue to operate Solera Corp. at the expense of Solera Holdings' bankruptcy estate.

[Remainder of Page Intentionally Left Blank]

33

## CONCLUSION

The free ride for Mr. Lopez must be put to an end.  His conduct evidences blatant breaches of fiduciary duties and manifest disrespect for the law.   For the foregoing reasons, Breakers Capital LLC respectfully requests that this Court grant the within motion in its entirety, and enter an order, substantially in the form of the proposed order annexed hereto converting the Debtor's case to a case under Chapter 7, and grant Breakers such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 10, 2014

RUBIN LLC

By: /s/ Paul A. Rubin
     Paul A. Rubin

345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com

Attorneys for Breakers Capital LLC

Motion to Convert

34